UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TERESA M. LANE,

                      Plaintiff

                                                DECISION AND ORDER

-vs-

                                                09-CV-6046 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                      Defendant.
_____

APPEARANCES

For the Plaintiff:            Catherine M. Callery, Esq.
                                   Empire Justice Center
                                   One West Main Street, Suite 200
                                   Rochester, New York 14614

For the Defendant:        Kathryn L. Smith, Esq.
                                   Assistant United States Attorney
                                   100 State Street
                                   Rochester, New York 14614

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied plaintiff Teresa Lane's ("Plaintiff") application for supplemental security income benefits. Now before the Court is Defendant's motion [#14] for judgment on the pleadings and Plaintiff's cross-motion [#15] for judgment on the pleadings. For the reasons that follow, Defendant's application is denied, Plaintiff's application is granted, and this matter is remanded for calculation of benefits.

PROCEDURAL HISTORY

On February 12, 2003, Plaintiff applied for supplemental security income benefits, claiming to be disabled due to "arthritis, asthma, [chronic obstructive pulmonary disease] COPD, sleep apnea, irritable bowel syndrome, high blood pressure, migraines, [gastroesophageal reflux disease] GERD, stress headaches, chronic kidney disorder, fibromyalgia, depression, [and] recurrent umbilical hernia." (64-66, 78).[1] The Commissioner denied the application. On February 15, 2006, a hearing was held before Administrative Law Judge Timothy M. McGuan ("ALJ"). On July 22, 2006, the ALJ issued a decision denying benefits, finding that Plaintiff could perform sedentary work. (17-25). On July 21, 2008, the Appeals Council denied Plaintiff's request for review. (6-9). On September 22, 2008, Plaintiff commenced the subject action. Subsequently, Defendant made several unopposed requests to extend the deadline for filing dispositive motions, which the Court granted.

VOCATIONAL HISTORY

Plaintiff was forty-six years of age at the time of the hearing, and had completed high school and some college courses. (84). Her employment history includes work as a cashier/ticket agent for Greyhound Bus Lines and as a supermarket cashier. (112). Plaintiff claims that she cannot remember any other employment prior to 1994. (125).

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety. It is sufficient for purposes of this Decision and

---

[1]Unless otherwise noted, citations are to the Administrative Record.

Order to note the following facts.

On September 4, 2002, Plaintiff began treating with D.A. Brubaker, M.D. ("Brubaker"), a primary care physician. Brubaker noted that Plaintiff had "a long list of medical problems," including chronic daily headaches, osteoarthritis, low back pain, hypertension, anxiety, high cholesterol, obesity, possible sleep apnea, carpal tunnel syndrome, COPD/asthma, and irritable bowel syndrome. (311). Brubaker stated that Plaintiff was taking Fioricet for headaches. With regard to anxiety and depression, Brubaker reported that Plaintiff was taking Xanax, but still often felt depressed and cried a lot. Upon examination, Brubaker noted that Plaintiff was "teary." Brubaker stated that he wanted to wean Plaintiff off Fioricet and Xanax, and place her on Inderal and Paxil instead. (312). On October 24, 2002, Brubaker saw Plaintiff again, at which time Plaintiff was attempting to wean herself off both Fioricet and Xanax. With regard to her headaches, Plaintiff reported a minimal change after taking Inderal. Brubaker opined that Plaintiff's headaches might be "analgesic rebound headaches" related to her use of Fioricet. Plaintiff complained of continuing low back pain, but said that the pain was improved from her last visit. As part of this same visit, Brubaker completed a form entitled, "Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination." (308-309). Brubaker indicated that Plaintiff had the following limitations: Moderately limited as to walking, standing, sitting, and climbing stairs; very limited as to lifting, carrying, pushing, pulling, and bending. (308). On February 14, 2003, Brubaker provided a letter to Plaintiff's attorney, summarizing her medical condition. (307). Brubaker stated, in relevant part:

> In regards to being on disability I would say that she is significantly limited in activities that require prolonged sitting or standing. She certainly cannot do lifting, bending, or physically continuous activities. In regards to use of judgment, interaction with peers, concentration and social aspects of employment I would not regard her as limited with the exception that when her headaches flare it does make it more difficult for her to concentrate and this could be a hindrance.

(307). On February 26, 2003, Plaintiff told Brubaker that her pain was much improved, as a result of treating with a rheumatologist, which treatment will be discussed further below. (344). Plaintiff stated that she was still having "intermittent headaches, though not daily," but that overall her headaches were significantly improved. (*Id*.). Brubaker reported that Plaintiff's depression was "stable." (345). On March 24, 2005, Brubaker completed a residual functional capacity ("RFC") assessment. (453-457). Brubaker stated that Plaintiff could occasionally lift and carry up to twenty pounds, occasionally reach, and frequently handle and feel. (453, 455). Brubaker stated that Plaintiff could never crouch, kneel, crawl, push, pull, or lift or carry more than twenty pounds. (453, 455). Brubaker indicated that Plaintiff could sit for four hours in an 8-hour workday, walk for six hours in an 8-hour workday, and never stand for any length of time. (454). Brubaker opined that Plaintiff's pain would often interfere with her attention and concentration, that her pain would frequently interfere with her sleep, and that her impairments were likely to cause her to have "good days" and "bad days," such that she would likely be absent from work more than four days per month. (457).

Between August 2002 and December 2002, Plaintiff treated with Billy R. Carstens, D.O., ("Carstens"), a pain management specialist, upon referral by Brubaker. On August 1, 2002, as part of an initial evaluation, Carstens noted that Plaintiff was complaining of pain in her back, neck, shoulders, arms, and legs. Plaintiff complained

4

of dull aching pain, with intermittent sharp pain and burning pain. (328). Plaintiff reported sleeping only two-to-three hours per night, because of pain. Upon examination, Carstens reported that Plaintiff had a depressed mood and flat affect, and that she scored 29 on the Beck Depression Inventory test, "which is consistent with severe depression." (328). Carstens observed a limited range of movement in Plaintiff's cervical spine, but a full range of motion in the lumbosacral spine. Carstens detected tenderness over the C1-C5 paraspinal muscles and T1-T4 paraspinal muscles bilaterally, and over the left T6 and T10 paraspinal muscles, as well as "diffuse trigger points . . . throughout the neck and back and upper extremities." (329). Carstens started Plainiff on Nortriptyline and Flexeril for pain. On September 27, 2002, Carstens reported that Plaintiff was participating in physical therapy, and was increasing her "functional mobility steadily." (323). Plaintiff stated that her sleep was improved, and that she was sleeping five-to-six hours per night. On December 5, 2002, Carstens noted that Plaintiff's physical examination was "unchanged from exam on 9/27/02," although he added a diagnosis of "fibromyalgia" to his list of "Impressions." (322). On April 28, 2003, Carstens completed an RFC assessment, indicating that, during an 8-hour workday, Plaintiff could sit for only one hour, stand for only one hour, and walk for only one hour. (390). Carstens stated that Plaintiff could lift and carry up to five pounds occasionally, and should never push or pull. When asked to state whether Plaintiff's restrictions limited her ability to maintain full-time employment, Carstens responded: Yes - she has severe neck and back pain + headaches, myofacial pain disorder in these areas that greatly restrict her activities." (390)

On November 5, 2002, James VanDeWall, M.D. ("VanDeWall"), a

5

rheumatologist, examined Plaintiff, upon a referral by Brubaker. VanDeWall stated that Plaintiff presented with "a history of chronic pain," for which she had tried a variety of therapies, including muscle relaxants, antidepressants, anti-inflammatory drugs, narcotic analgesics, corticosteroids injections, and trigger-point injections, without much success. (333). Plaintiff reported having pain, that was "global and diffuse," poor sleep, vague numbness, paresthesias (sensation of pins and needles), and generalized poor mood and affect. (*Id.*). VanDeWall noted that Plaintiff was obese, and that her "mood and affect are very poor." (334). Plaintiff had normal range of movement in her joints, but had "numerous tender points" "along the paraspinal region of the axial skeleton and diffusely throughout the peripheral skeleton." (*Id.*). VanDeWall diagnosed Plaintiff with fibromyalgia, and prescribed Topamax. VanDeWall also noted that Plaintiff's sleep apnea might have something to do with her pain and depression. (335). On January 6, 2003, VanDeWall examined Plaintiff and reported that she was responding "very well" to Topamax, and seemed to be "in much better spirits." (331). VanDeWall found Plaintiff's condition essentially unchanged, noting that he found "[n]umerous tender points . . . in a very traditional fashion for fibromyalgia." (*Id.*). On February 28, 2003, VanDeWall noted that Plaintiff was "overall doing much better." (351). VanDeWall stated that Plaintiff was reducing her medications, attempting physical conditioning, and sleeping well. Upon physical examination, VanDeWall reported finding "tender points [that were] still present in a very traditional fashion for fibromyalgia, but [were] much less exquisite than in prior examinations." (352). On March 24, 2004, VanDeWall noted that he had not seen Plaintiff in a long time, and that she had recently been in an automobile accident, which had increased her pain. (461). VanDeWall examined

6

Plaintiff and found "numerous tender points . . . in a very traditional fashion for fibromyalgia." On March 30, 2003, VanDeWall saw Plaintiff again, and reported that while she indicated that she felt better overall from using Topamax, she was still complaining of pain "in a global fashion," with mild sleep disturbance. VanDeWall increased Plaintiff's dosage of Topamax and urged her to exercise. (460). On July 16, 2004, VanDeWall examined Plaintiff, and noted that she was doing "excellent" on Topamax and Percocet. On physical examination, Plaintiff's joints were tender. VanDeWall noted that Plaintiff's physical activity had increased, and was "not . . . limited by fibromyalgia pain." (462).

On March 13, 2003, O. Castro, M.D. ("Castro") diagnosed Plaintiff with sleep apnea, following "attended overnight polysomnography" testing. (364). Castro recommended that Plaintiff use "nasal CPAP therapy." (*Id*.).

In or about January 2003, Plaintiff began treating with Lixin Zhang, M.D. ("Zhang"), at the Dent Neurological Institute, upon a referral by Brubaker. (346, 370). According to Brubaker's notes, he referred Plaintiff to Zhang because of her chronic daily headaches. (346). It appears that Zhang treated Plaintiff for approximately four months, focusing on Plaintiff's headaches, depression, and sleep apnea. (370). On April 21, 2003, Zhang completed an RFC assessment, which bears little resemblance to the other assessments in the record. (369-375). Specifically, Zhang stated that Plaintiff had no limitations with regard to sitting, standing, or walking, that she had full strength and could frequently lift up to twenty pounds, that she had no postural limitations, and

7

that she could frequently bend, squat, crawl, and climb. (369-374).[2]

On May 1, 2003, Plaintiff was examined by Steven Dina, M.D. ("Dina"), a non-treating consulting physician, apparently specializing in internal medicine. (407-411). Dina examined Plaintiff and diagnosed her with fibromyalgia, joint pain consistent with osteoarthritis, hypertension, depression/anxiety, COPD, recurrent umbilical hernia, and possible sleep apnea. (410). Dina stated that Plaintiff's depression/anxiety and hypertension would not cause her any functional limitations. Dina stated that the fibromyalgia and osteoarthritis pain would cause "moderate limitations." On this point, Dina stated that Plaintiff should avoid "walking distances," bending, squatting, kneeling, going up and down stairs, straining, lifting, repetitive bending, and repetitive gripping and grasping. (411).

On May 1, 2003, Thomas Dickinson, Ph.D. ("Dickinson"), a non-treating psychologist, conducted a psychiatric examination. (420-426). Plaintiff complained of depression, frustration, feelings of worthlessness, insecurity, and poor concentration. Plaintiff also described a history of alcohol abuse, ending in 1981. Dickinson observed that Plaintiff was cooperative, with adequate social skills. (422). Plaintiff's thought processes were coherent and goal directed, her affect was full and appropriate, her speech was fluent and clear, and her concentration, memory, and attention were intact. (422-423). Plaintiff's cognitive functioning was average, and her judgment was fair.

---

[2]It is unclear whether Zhang's RFC assessment was intended to evaluate Plaintiff's abilities only in light of her neurological complaints. In that regard, it is unclear whether Zhang's opinions regarding Plaintiff's ability to lift, sit, stand, and walk were intended to indicate merely that Plaintiff's abilities in those areas were not affected by her headaches, depression, and sleep apnea. To the extent that Zhang intended to indicate that Plaintiff's ability to lift, sit, stand, and walk were unaffected by any of her other medical complaints, the opinion is clearly inconsistent with the rest of the substantial medical evidence.

8

(423-424). Dickinson saw no signs of depression, anxiety, negativism, suspiciousness, or significant emotional distress. (424). Plaintiff's ability to read and spell were at the college level. (*Id.*). Dickinson's diagnosis included dysthymic disorder, mild panic disorder with agoraphobia, PTSD[3], and alcohol abuse in remission. (425). Dickinson opined that Plaintiff could understand and follow basic job directions and perform repetitious tasks with mild supervision. (424). In that regard, Dickinson noted that Plaintiff seemed able to maintain attention and concentration and to make basic decisions. However, Dickinson cautioned that Plaintiff would have difficulty performing tasks in a consistent and reliable manner, because of her physical and emotional problems. (425). Dickinson also stated that Plaintiff would have mild troubles dealing adequately with supervisors, co-workers, and customers. (*Id.*).

On May 9, 2003, George Burnett, M.D. ("Burnett"), a non-treating, non-examining agency review physician, completed a Mental Residual Functional Capacity Assessment (429-432) and a Psychiatric Review Technique form (433-446). Burnett stated that Plaintiff would be moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule and maintain regular attendance, her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, her ability to accept instructions and respond to criticism from supervisors, her ability to get along with co-workers, her ability to respond to changes in the work setting, and her ability to set realistic goals. (429-430). Burnett

---

[3]Related to alleged abuse by an ex-husband.

further stated that Plaintiff would have a moderate degree of limitation in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace. (443).

On February 10, 2005, Plaintiff was evaluated by Mariusz Morawski ("Morawski"), a Physical Therapist[4], upon a referral by Brubaker. Morawski concluded that Plaintiff was physically capable of "sedentary work." (127-134). Morawski attempted to have Plaintiff complete 21 tasks, but she completed only eleven. As to that, Morawski observed that on the uncompleted tasks, Plaintiff "stopped the task before specific physical signs of a safe maximal effort were observed." (127). Morawski stated:

> Self-limiting participation may be due to one, or any combination, of several factors. Some common factors contributing to a self-limiting participation are: pain, fear of pain, fear of injury/re-injury, depression, anxiety, lack of familiarity with a safe physical maximum, and lack of motivation to perform maximally secondary to perceived financial gain. The client's reported reasons for self-limiting participation were: Pain in multiple areas of her body, including the lower back, legs, neck and shoulders, pulling/straining feeling in back and abdomen area, and fear of re-injury.

(129). Morawski indicated that Plaintiff could walk "frequently," meaning up to 2/3 of the workday, or 5.3 hours. (129). Morawski stated that Plaintiff could sit "occasionally," meaning up to 1/3 of the workday, or 2.6 hours. (*Id.*). Morawski stated that Plaintiff should never stand, kneel, squat, or crawl. (132-133). Morawski observed that Plaintiff was limited by poor conditioning, shortness of breath, and pain. (130). Overall,

---

[4]Physical therapists are not acceptable medical sources for purposes of establishing an impairment. 20 C.F.R. § 404.1513(a). However, evidence from a physical therapist may be considered to show the severity of an impairment and how it affects the claimant's ability to work. 20 C.F.R. § 1513(d)(1).

Morawski concluded that Plaintiff was "capable of sustaining the sedentary level of work for an 8-hour day." (128).

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above,

11

the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.")  However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[5] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[6]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other

---

[5]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[6]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

12

substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such

13

as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

\*\*\*

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a). The regulation further states, in relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

## THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments:

"lumbar spine dysfunction, fibromyalgia, headaches, sleep apnea, chronic obstructive pulmonary disease, diabetes mellitus, dysthymia, and obesity." (19). The ALJ found that Plaintiff also had post-traumatic stress disorder and panic attacks, but that such conditions were not severe. At the third step of the analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. At the fourth step of the analysis, the ALJ found that Plaintiff was not able to perform her past relevant work. In that regard, the ALJ found that Plaintiff had the following RFC:

> [C]laimant has the [RFC] to perform the physical requirements of sedentary work, which is the ability to lift and carry up to 10 pounds occasionally, sit for at least six hours a day, and stand for up to two hours a day. She can occasionally complete complex and detailed tasks. She can occasionally perform postural activities. She can frequently finger and handle. She should avoid exposure to dust, fumes, gases, and other respiratory triggers. She should avoid heights and concentrated exposure to noise.

(23). In making this finding, the ALJ stated that he had considered the medical evidence in the record, and gave the "greatest weight" to Exhibit C7E, which was Morawski's "Work Performance Evaluation Summary" completed on February 10, 2005. (127-134). The ALJ found that Brubaker's and Carstens' opinions were "not well supported." (19). The ALJ summarized Brubaker's March 2005 RFC report, stating, "Dr. Brubaker said the claimant could perform light work with no standing, but with up to six hours of walking." (21). However, the ALJ failed to mention that in the same report, Brubaker stated that Plaintiff could sit for only four hours in an 8-hour workday. (*See*, 454). The ALJ also stated that he found Plaintiff's statements concerning her symptoms were "not entirely credible." (23). At the fifth step of the five-step analysis,

the ALJ found that Plaintiff was not "under a disability within the meaning of the Social Security Act since February 12, 2003, the date the application was filed." (17). In making that determination, the ALJ relied primarily on the grids, finding that Plaintiff's non-exertional limitations had "little or no effect on the occupational base of unskilled sedentary work." (24). Consequently, the ALJ did not obtain evidence from a VE.

ANALYSIS

Plaintiff maintains that the ALJ erred in three respects: 1) By failing to properly apply the treating physician rule; 2) by failing to obtain evidence from a VE; and 3) by failing to properly evaluate her credibility.

At the outset, the Court agrees that the ALJ did not properly apply the treating physician rule. As discussed above, when an ALJ decides not to give controlling weight to a treating physician's opinion, he must consider the factors set forth in 20 C.F.R. § 416.927(d), and must give "good reasons" for the decision. In this case, the ALJ did not give controlling weight to the opinions of Brubaker and Carstens, and instead relied on the opinion of Morawski, a non-treating physical therapist who examined Plaintiff on one occasion, stating merely that such opinions by Brubaker and Carstens were "not well supported." Such a cursory statement is insufficient.

Moreover, even assuming that the ALJ was correct to give controlling weight to Morawski's opinion, such opinion does not support the ALJ's RFC determination that Plaintiff could "sit for at least six hours a day, and stand for up to two hours." (22-23). Rather, Morawski opined that Plaintiff could sit only "occasionally,"[7] meaning up to one-

---

[7] *See*, SSR 96-9p, 1996 WL 374185 at *3 ("'Occasionally' means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday.").

third of the day, and that she could never stand. (129). On this point, Morawski's opinion was similar to that of Brubaker, who stated that Plaintiff could sit for only four hours, and never stand. (454).

Furthermore, Morawski's opinion does not support the ALJ's conclusion that Plaintiff could perform sedentary work[8], since sedentary work generally involves sitting more than occasionally.[9] In that regard, the Commissioner recognizes that for sedentary work, "[s]itting would generally total about 6 hours of an 8-hour workday." SSR-96-9p, 1996 WL 374185 at *3 (1996); *see also, Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 n. 5 (2d Cir. 2001). ("The ability to sit for a total of four hours does not generally satisfy the standard for sedentary work. According to the Social Security Administration, "sedentary work 'generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day.'") (quoting *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir.2000), *abrogated on other grounds*).

The Court also agrees with Plaintiff that the ALJ erred by failing to obtain evidence from a VE, or other similar evidence. As the record almost uniformly indicates, Plaintiff's exertional limitations preclude her from sitting for long periods, which erodes her ability to perform a full range of sedentary work:

---

[8]Morawski opined that Plaintiff was capable or working at the "sedentary level." (127). However, the issue of Plaintiff's RFC is one that is reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). To the extent that the ALJ relied on that conclusion by Morawski, the ALJ committed error.

[9]*See*, 20 C.F.R. § 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

.

> In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. *If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded. The extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work.*

*Id*. at *6 (emphasis added). Moreover, as discussed above, if a claimant has nonexertional impairments which significantly limit the range of work permitted by his exertional limitations, then the Commissioner cannot rely upon the grids, and instead must introduce evidence from a VE, or other similar evidence. *See*, SSR 96-9p, 1996 WL 374185 at *5 ("Where there is more than a slight impact on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do other work, the adjudicator must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country."). Here, the record indicates that Plaintiff has nonexertional impairments, including pain and dysthymia, that affect her ability to, *inter alia*, concentrate, perform complex tasks, and complete a regular workday or work week without excessive absences. The ALJ gave scant attention to these non-exertional impairments in his decision. In light of Plaintiff's exertional and non-exertional impairments, the ALJ's finding that Plaintiff could perform essentially a full range of sedentary work, was erroneous. *See, Dailey v. Barnhart*, 277 F.Supp.2d 226, 234-235 (W.D.N.Y. 2003) (It was error for ALJ to find that claimant could perform a full range of sedentary work, where the claimant could not sit for a total of six hours in an 8-hour workday).

The Court also agrees with Plaintiff that the ALJ erred in evaluating her credibility. In that regard, the ALJ's cursory finding that Plaintiff's statements concerning her symptoms were "not entirely credible" does not satisfy the requirements imposed by 20 C.F.R. § 416.929. To the extent that the ALJ's decision indicates that the only reason that Plaintiff gave for failing to seek work was that she had "breathing problems," the decision does not accurately reflect Plaintiff's testimony or the rest of the record.

In this case, Plaintiff has exertional limitations, including the ability to sit only occasionally and the inability to stand, as well as various non-exertional limitations, which together significantly erode the occupational base for sedentary work. Based upon all of the foregoing, it appears that Plaintiff cannot perform sedentary work, and that a remand solely for calculation of benefits is appropriate. *See, Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.1980) (Holding that remand for calculation of benefits is proper "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose.").

CONCLUSION

For the reasons discussed above, Defendant's motion [#14] is denied, Plaintiff's motion [#15] is granted, and this matter is remanded solely for the calculation of benefits, pursuant to 42 U.S.C. § 405(g), sentence four.

So Ordered.

Dated: Rochester, New York
    March 22, 2010

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge